EDWARD L. McCREA ET AL., APPELLEES, v. WILBUR W. DAY, APPELLANT.

FILED MAY 23, 1925. No. 23099.

1. **Process: SUMMONS TO ANOTHER COUNTY.** Where a suit is properly begun in any county in this state, and among other things plaintiff prays that the title to real estate be quieted, process may issue to any other county in the state to bring in a person resident therein who has or claims an adverse interest in the real estate.

2. **Trial: REFERENCE: ASSERTION OF CLAIM AFTER DISTRIBUTION.** Certain funds were distributed by a referee, pursuant to the court's order, among certain parties to a pending suit. Subsequently a defendant, who filed his original answer long prior to the appointment of the referee, set up a claim, in a supplemental answer, for the fund which had been distributed. The claim so pleaded was not referred to in the original answer, nor was the court, at any time before the referee's appointment, advised of claimant's alleged rights. No fraud or other circumstance is pleaded, or called to the court's attention, by which the claimant was prevented from asserting his alleged rights in apt time. *Held*, that the court did not err in denying the claim set up in the supplemental answer.

3. **Appeal: REVERSAL IN PART.** Under the pleadings and the evidence herein, *held*, that the judgment against defendant Day must be reversed, except as to the court's denial of his right to all or any part of the fund which was distributed to other

parties to the suit, and as to this exception the judgment is affirmed.

APPEAL from the district court for Pawnee county: JOHN B. RAPER, JUDGE. *Affirmed in part, and reversed in part.*

*Peterson & DeVoe* and *Max V. Beghtol,* for appellant.

*Good & Good* and *A. M. Bunting, contra.*

Heard before ROSE, DEAN, GOOD, THOMPSON and EVANS, JJ., REDICK and SHEPHERD, District Judges.

DEAN, J.

December 14, 1918, certain subscribers entered into a written "Agreement and Declaration of Trust," hereinafter called the declaration, whereby the "Cooperative Garage and Delivery," hereinafter called the organization, was brought into being. The object of the organization, as disclosed by the declaration, was to install a system of highway motor transportation, for the carrying of freight to market, such as grain, live stock, and farm produce, and to make door to door delivery of merchandise and the like, all for hire, by the use of motor transportation trucks, in Nebraska and adjoining states, "for members only of Cooperative Garage and Delivery." The declaration also provided for the election of three or more trustees and for the election of a president, vice-president, treasurer and secretary upon whom should devolve the duties incident to like offices in corporations. Shares in the enterprise were denominated "certificates of interest." On the face of each certificate appears the statement that the organization is "an unincorporated company," and that it is "organized and existing under and by virtue of the common law." The organization was denominated "a common-law trust," and it is alleged that it was not subject to control by the state railway commission nor to the provisions of the "Blue Sky Law." Within a few months after the organization was completed it was discovered that the project was not then workable and operations ceased.

McCrea v. Day.

Thereupon this suit was begun by upwards of 40 plaintiffs in the district court for Pawnee county, to bring the affairs of the organization to a close and to recover judgment against the defendants for the money paid by plaintiffs for certificates of interest. Plaintiffs had severally purchased one or more of the certificates, so that each one of the numerous parties who joined in the petition herein was, respectively, individually, and severally, the owner of one certificate or more. That is to say, no owner of a certificate or certificates had or claimed any right, title, interest or ownership in the certificate or certificates owned by any other party to this suit. Wilbur W. Day and 12 others were named as defendants. Plaintiffs alleged, among other things, that Day was one of the main promoters of the enterprise and, charging that the subscribers were induced to purchase the certificates by fraudulent representations, they demanded judgment against Day and five of his codefendants for the several amounts represented by the certificates of interest which they owned. The organization was the owner of certain real estate in Table Rock, which approximated $1,000 in value, which was bought for a terminal station. Plaintiffs prayed for an accounting, and also that the Table Rock property, which was the only property it owned, be sold and the proceeds be paid over to the plaintiffs as their respective rights should appear, in partial satisfaction of their several demands, and for general equitable relief.

In his separate answer Day pleaded generally that he and three others were trustees of the organization; that early in 1919, at a Table Rock meeting of citizens, he informed them, in substance, that the organization papers were drawn up and that its legality had been carefully guarded by able and competent counsel; that one of these was a former attorney general of Nebraska; that the others were prominent Lincoln lawyers; that their advice was that each owner of certificates "would be liable only to the amount of his holdings; * * * that no person other than a member and holder of certificates of interest would be

McCrea v. Day.

·entitled to enjoy the transportation facilities." Day further alleged that two motor trucks were subsequently bought on which $1,550 was paid; but, as soon as it was discovered that the project was not then practicable, they were surrendered to the sellers in satisfaction of the purchase price liens; that four or five months after operations began defendant "requested these plaintiffs or some of them to relieve him of his duties under said trust agreement and to undertake the operation and management * * * themselves, which plaintiffs and each of them refused to do;" that defendant acted in the utmost good faith; that the ·organization was cooperative in fact; that it was well known to all parties concerned that money for the establishment of the enterprise "was to be raised by selling the requisite amount of certificates of interest to parties who would have merchandise to move between the points where the trucks were to operate;" and that it was clearly understood that much would depend on road and weather conditions, and that the business would be slow at first, but it was generally believed it would ultimately be successful; that there was no waste nor improper expenditure of money, and that he was ready and willing to give a full account of his acts to the court.

The court found generally that the "Cooperative Garage and Delivery" not only ceased operations, but that it was insolvent and should be dissolved; that 125 "certificates of interest" were fraudulently obtained by the pretended owner of a Lincoln garage for a lease thereof, and that the certificates, being without consideration, should be and they were canceled; that the sole and only share owned by Day and the shares owned by nine others be canceled; that no personal liability attached to any defendant except Day, and that 12 or more of the purchasers of "certificates of interest" were entitled to recover from Day the several amounts respectively paid by them therefor, approximating $4,300, with interest and costs; that 31 of the plaintiffs should be, and were, denied the relief for which they prayed; that the sale of the Table Rock property, which was sold

for $1,000, and netted $943.36, should be and accordingly
was confirmed. Continuing the court found "for the (thir-
teen) plaintiffs and (one) defendant below named and
against the defendant Wilbur W. Day because of misrepre-
sentations as alleged in the petition and in the amounts as
set forth" in the decree. Here follows a recital in the de-
cree of the names of 13 or 14 purchasers of certificates, in
sums ranging from $100 and upwards, being approximately
$4,300, as noted above, "said several amounts being the sub-
scription price paid for their respective shares, * * *
less the distribution amount heretofore paid by the special
commissioner for the *pro rata* share ($10.72 for each
share) resulting from sale of the (Table Rock) property
as heretofore decreed." The court further found and de-
creed that Day recover nothing by reason of his counter-
claim and the facts pleaded in his supplemental answer.
Day has appealed from the judgment rendered against him.
The 31 plaintiffs, who were denied any relief, have filed
a cross-appeal.

As tending to support their contention, plaintiffs intro-
duced in evidence an instrument purporting to be a partial
copy of the garage lease, hereinbefore mentioned, wherein
certain personal property is described, which is ordinarily
found in a repair garage, but no consideration is named
therein nor is a signature appended thereto. The contention
is that the lease-hold interest in the garage was bought by
Day, when it was already mortgaged for its full value, and
that by his carelessness and negligence this fact was not dis-
covered until after the purchase price thereof, namely, 125
"certificates of interest" were given in exchange therefor.
In this connection it may be noted that plaintiffs called Day
as a witness and he testified that the lease was prepared
before he became a trustee, and that, about 30 days after
it was obtained, the prior incumbrances were discovered.
It further appears that, because of the alleged fraudulent
act of the vendor of the lease, he fled from the state and was
then a fugitive from justice. On his own behalf Day testi-
fied that he obtained an affidavit from the seller of the

garage lease wherein he averred that the property was free from incumbrances and that one of the organization's counsel informed the trustees that the title to the garage property was good. But when it was found that it was incumbered the trustees "ordered the stock all canceled, unless he (the seller) could fix it up." None of this evidence was denied. This feature, however, may be dismissed with the observation that, in view of the evidence, it is obvious that no financial loss was occasioned by the transaction.

By leave of court Day amended his original answer, and therein alleged that the court had no jurisdiction over his person, nor did it have jurisdiction to render a personal judgment against him. The argument is that he was, at all times material to this action, a resident of Lancaster county, and that process issued out of Pawnee county was irregularly served on him in Lancaster county. He contends that there is no joint liability between him and any defendant resident of, or served with process in, Pawnee county. However, it is shown by the county records that Burow, one of the resident Pawnee county defendants, was the record owner of a part of the Table Rock premises in question here when it was purchased by the organization. True, in his answer Burow disclaimed any present interest in the real estate, and averred that he, by an unrecorded instrument, has disposed of all his interest therein. Nevertheless, it seems to us that, in order to clear the title to the Table Rock real estate, Burow was properly made a party defendant. It therefore follows that Day, even though a non-resident of Pawnee county, was properly served with processes in Lancaster county.

Day, besides amending his answer, filed a supplemental answer wherein he alleged that W. R. Fay, an employee of the organization, recovered a judgment against him in the district court for Lancaster county, for $957.93, for money advanced and for services performed for the organization upon his solicitation. On appeal to this court a remittitur was filed, and a judgment for $787.13 was thereupon affirmed, the costs being taxed to plaintiff therein.

Day argues that, "as shown by said pleadings and by the opinion of said court," in *Fay v. Day,* 106 Neb. 370, the case "was based entirely upon the fact that this defendant was a trustee for the Cooperative Garage and Delivery," and not for the benefit of Day, and that he "will eventually be compelled to pay the same" and is therefore now entitled to recover in this suit the amount thereof, with interest and costs, out of the net proceeds arising from the referee's sale of the Table Rock property, or from any money in the hands of, or controlled by, the court. But Day's supplemental answer was not filed until January 24, 1922, and in their reply thereto, which was filed eight days thereafter, plaintiffs point out that in July, 1921, the court had already appointed a "special master commissioner" to sell the real estate in question, and that about three months thereafter, namely, October 29, 1921, the court ordered a distribution of the proceeds of the sale and, pursuant thereto, the money was distributed by the commissioner "among the plaintiffs and other persons entitled thereto." It appears to us that from the foregoing facts the court did not err in denying Day's claim for relief, so far as it is made to depend upon such funds as had once been under the court's control but were, by the court's order, distributed before the supplemental answer was filed. And on this feature of the case we base our decision solely on this ground. For obvious reasons, and in view of our decision on the merits, further comment is deemed unnecessary in respect of the *Fay* case and the argument of counsel relating thereto.

A review of the record convinces us that the judgment must be affirmed so far as it relates to the causes of action pleaded in Day's amendment to his answer and in his supplemental answer. But in all else, so far as the findings are adverse to Day, the judgment must be reversed. It may be added that other questions are raised which we do not discuss and do not find it necessary to decide.

The evidence, when considered in its entirety, fairly supports the allegations of defendant's answer. Day testified that he did not profit a single dollar by reason of his con-

nection with the organization; and this is not denied by any witness. He further testified that he expended $300 or $400 in behalf of the organization, and that, besides, he paid his own expenses to a distant city on business relating to the organization's affairs, and that none of this money was recovered by him. And there is no proof to the contrary in respect of any of these matters. It appears, too, from the undisputed evidence, that Day lost more money, by far, in the enterprise than any plaintiff or other party to this suit. Day further testified that the single "certificate of interest" which he owned, and which he voluntarily surrendered, was given him so that he might qualify as trustee.

Several causes worked together to bring about a cessation of the activities of the enterprise. In the natural order of things the expected happened and, in consequence, public interest waned. The rain descended and the floods came on the earthen roads, as the plaintiffs and every one else in this latitude knew they would.

Plainly speaking, the net result was that, somewhere between Pawnee City and Lincoln, two motor-propelled freight trucks were tied up in the mud. And here the end began. But on unpaved highways could anything else be expected by reasonable men? Was Day to blame because the traveled road from Lincoln to Pawnee City was not topped with gravel nor surfaced with cement? The mischief is that the enterprise, in itself feasible, was prematurely launched by a few years, and only by a few. To argue that Day made the Pawnee defendant citizens believe that a fleet of heavily loaded motor-propelled freight trucks could skim over hub-deep mud roads to and from their county seat town is plainly absurd. It is everywhere well understood in Nebraska that, in the absence of paved or graveled highways, neither passenger automobiles nor freight trucks can overcome the untoward road conditions which attend an excessive rainfall. And this contingency was talked over at their public meetings. They all took it into account and all of this was well known to plaintiffs and all parties here concerned. True, Day used trade talk.

He was apparently an enthusiast. But the record does not disclose a dishonest act on his part. From the amount of money he invested it is evident that he believed that success would follow their joint efforts. And others were like-minded. It appears that one of the plaintiffs, a prominent and influential citizen of Pawnee county, went out and held public meetings and invited his neighbors and friends to join in the progressive enterprise. But when the project collapsed he excused himself by saying, among other things, that he heard Day say that the project was workable and that he believed what Day said because he was associated in business with good men in Lincoln. And no one thought of making this citizen a party defendant.

We conclude that, under the pleadings and evidence, Day was properly made a party defendant. We further conclude that the judgment against Day must be and is reversed, except as to the court's denial of his right to all or any part of the fund which was distributed to other parties to the suit, and as to this exception the judgment is affirmed. The judgment is also affirmed as to the cross-petitioning appellants. In view of our decision, we do not find it necessary to decide whether plaintiffs were properly joined. Comp. St. 1922, sec. 8535.

AFFIRMED IN PART, AND REVERSED IN PART.